IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARY NOLAN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 07-813 |
| | ) | |
| ERIC K. SHINSEKI, Secretary of the | ) | Judge Lancaster |
| Department of Veterans Affairs, | ) | Magistrate Judge Mitchell |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

I.      Recommendation

It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendant Eric K. Shinseki, Secretary of the Department of Veterans Affairs (Docket

No. 34) be granted.

II.     Report

Plaintiff, Mary Nolan, brings this action against Defendant, Eric K. Shinseki, Secretary of

the Department of Veterans Affairs, alleging that she was unlawfully terminated from her

position as a social worker with the Department of Veterans Affairs ("VA") on December 17,

2005 because of her disabilities (Systemic Lupus Erythematosis and Immuno-Suppression;

degenerative joint disease in both feet and legs; history of multiple stress fractures in spine, hip,

both feet and legs; Lymphedema; Osteo- and rheumatoid arthritis throughout the body;

Discectomy at L4-L5; Rotator Cuff surgeries for both left and right shoulders; Right total knee

replacement; Left triple arthrodesis; Hypertension; Mitrovalve Prolapse; Diverticulitis; Seizure

disorder; Neurogenic Bladder; Osteoporosis; chronic pain) and in retaliation for her prior EEO

activity (an EEO order finding in her favor).

Presently before this Court for disposition is a motion for summary judgment filed by Defendant.  For the reasons that follow, the motion should be granted.

Facts

Plaintiff earned a bachelor's degree in social work from the University of Pittsburgh in 1992.  (Nolan Dep. at 12-13.)[1]  She earned a master's degree in social work from the University of Pittsburgh in 1994.  (Id.)

Plaintiff began her employment with the VA in October of 1994, at the Highland Drive facility.  (Id. at 17.)  Her initial position with the VA following receipt of her master's degree was "social worker."  (Id. at 17-18, 20.)  She held the position of "social worker" throughout her employment with the VA.  (Id. at 20.)

From approximately 1996 or 1997 until her termination on December 17, 2005, Plaintiff served as a social worker in the behavioral health service line of the VA.  (Id. at 24.)  She was terminated from her employment with the VA effective December 17, 2005.  (Id. at 40, 71-72.)

In 2000 or 2001, Plaintiff began working as a social worker in the Center for Treatment of Addictive Disorders ("CTAD"), which was part of the VA's behavioral health service line.  (Id. at  27.)  When asked to describe a typical day as a social worker in CTAD, Plaintiff testified as follows:

> Get to work, as soon as I get into work, I viewed my emails, and then we had a treatment team meeting about 8:15 in the morning, which would usually last a half hour, 45 minutes. And at that particular point in time, I would participate with the team, I would prepare – if I had a new client, I was prepared to inform the staff about what was going on with them, and my recommendations, and we would discuss that. So that was usually like a half hour, 45 minutes.

---

[1]Def.'s App. (Docket No. 35) Ex. A.

> Afterwards, I either had a group at that particular time, group therapy, or I was scheduled to see outpatients or also to follow up with the inpatients in the program, the drug and alcohol program. So I also worked part time for the morphine program, and the outpatient program, so I was sort of being pulled in many different directions. So it's hard to say what a typical day was, but the typical day was meeting with clients, conducting initial assessment evaluations, then I was also responsible for conducting lengthy social work assessments on the computer. Usually it would take one hour. Also, there was – I was told that we utilize what's called ASI . . . Addiction Severity Index. That was on the computer, and I was responsible for following and administering that particular assessment tool to whatever patients I had. And then I conducted, as I said, therapy groups that lasted anywhere from 45 minutes to an hour, to an hour and a half. Some groups had six people, some had 15, sometimes we were up to almost 30 group members.
>
> I was also responsible for documenting all activity [], so for each age group I was responsible for documenting for each person what happened in that group in that particular day. And, then, also, whatever happened with individual clients that I saw, you know, interviewed, whether there were assessment tools that I needed with them, and then had to document that.

(Id. at 28-29.)

Plaintiff testified that there was a treatment team meeting every day and that "every staff person" in the CTAD was required to attend these meetings.  (Id. at 29-30.)  With respect to group therapy sessions, she testified as follows:

> Some days I might not have any groups. Other days I might have two groups. It would all depend on how the schedule was set up. Having limited space, you know, we had other people who ran groups as well, so we did have limited amounts of space. Some days there were [sic] no group therapy, other days I might have two, sometimes even three. Plus, [I] also conducted social workgroups once a week for the patients who were residing in the domiciliary program, and usually that was like 30, 45 patients. And, so, I conducted that, and that was quite extensive because we had to document after each patient afterwards.

(Id. at 30.)  She testified that her responsibilities during the group sessions were "[l]eading discussions, sometimes putting a video in and watching, and then talking about it afterwards. But it is mainly one-on-one – not one-on-one, but discussions between group members, and,

3

usually, there is a topic for the day."  (Id. at 30-31.)

Plaintiff also conducted one-on-one therapy sessions with clients.  (Id. at 31.)  When

asked how frequently she conducted one on one therapy sessions with clients, she stated:

> A: Depending on whether or not they were actually in the inpatient program.
> There is an inpatient program that the patients actually stay at the domiciliary, and
> then come to the program Monday through Friday, and usually would receive – at
> one time I might have three or four of those patients, so that would mean seeing
> them on a regular basis, once a day, sometimes twice a day. and then I was also
> responsible for following up [with] those who had left the [inpatient] program.
>
> So, seeing these people on an outside basis, they would come in, and so I might
> see them on a weekly basis or biweekly.
>
> Q: And they would come in to have in-person appointments with you at CTAD, is
> that correct?
>
> A: Individual. That's correct.

(Id. at 31.)

Plaintiff's Position Description states that a social worker is "a member of a

multidisciplinary team."  (Def.'s App. Ex. B at A.1.)  It states that one of the "major duties" of

the social worker includes "provid[ing] the full range of social services with patients who have a

variety of social needs in addition to medical and/or psychiatric disabilities." (Id. at A.9.)  It

indicates that, "relative to treatment and discharge planning goals, the incumbent is charged with

coordinating those services intra VA and in the community, which positively impact on the needs

of the patient and his/her significant others."  (Id. at A.3.)  Further, it states that "consistent with

sound social work practice, quality assurance standards and service recording policy, the work is

mandated to document pertinent patient activity and findings."  (Id. at A.4.)  It states that the

social worker will "provide[] a meaningful learning experience for social work students and

assume[] professional responsibility for staff of lesser grade and experience."  (Id. at A.5.)  It

states that the social worker may "serve[] in an acting capacity during supervisor's absence."  (Id. at A.8.)  A social worker is "expected to assume full responsibility for case situations presenting a wide range of problems, with no limitation as to their difficulty.  Service is usually provided within the context of a multi-disciplinary team approach to problem resolution."  (Id. at B.4.)

Plaintiff's Position Description has a specific section entitled "Personal Contacts," which states that the social worker "has a myriad of involved contacts with team members, veterans['] relatives, colleagues, trainers, administrators, representatives of community groups and institutions and members of the intra VA groups and services."  (Id. at B.6.)  It states that personal contacts "are essential to evaluating the patient's situation and marshalling of resources which will result in optimal problem resolution. They are also made to educate, inform, train, and advise."  (Id. at B.7.)

Plaintiff acknowledged that her last day of work at the VA was June 14, 2004 and that she was absent from work for over a year and a half.  (Nolan Dep. at 77.)  She used a combination of sick leave and leave without pay during her absence from work between June 14, 2004 and December 7, 2005.  (Id. at 83.)  Her requests for leave between June 14, 2004 and December 7, 2005 were granted.  (Id.)[2]

Plaintiff states that the VA has a policy, when employees are on extended leave, of placing their clinical privileges on an inactive status so that they do not expire.  (Pl.'s Ex. 5.)[3] She contends that the VA failed to do this and therefore her clinical privileges expired.  (Nolan

---

[2]Defendant states that her requests for leave were granted until December 17, 2005, but the record reflects that the termination letter was dated December 7, 2005.  Thus, to the extent that leave was requested beyond that date, it was not granted.

[3]Docket No. 41.

Dep. at. 61.)[4]  She further contends that she received a notice that her clinical privileges would

expire effective July 1, 2005 if she did not replenish her continuing education credits, that she

inquired about her 28.5 surplus credits and discovered that they had been used in keeping her

clinical privileges current during her leave because she had not been placed on "inactive" status

and that it was not until she asked Dr. Jeffrey Peters's office for assistance with this problem that

the following events occurred.  (Id.)

By letter dated June 14, 2005, Dr. Jeffrey Peters, Vice President of the Behavioral Health

Programs for the VA Pittsburgh Healthcare System, informed Plaintiff that:

> A recent review of your attendance record disclosed you have not returned to duty
> since June 14, 2004. Although your absences may be for compelling reasons
> beyond your control, they have continued beyond a reasonable time, and have
> directly impacted upon patient care. Please let this serve as a notice that unless
> you promptly become available for duty on a regular, full-time basis, an adverse
> action may be initiated against you. Please be advised [of] the Medical Center's
> need to have your position filled with an employee who is available for duty on a
> regular, full-time basis.

(Def.'s App. Ex. C.)  By letter dated June 23, 2005, Plaintiff's attorney, Iphigenia Torlidas,

informed Dr. Peters that she was "in receipt of [his] letter dated June 14, 2005."  She further

informed him that "[t]his letter will confirm that my client is returning to employment.  Kindly

contact my office with regard to this matter."  (Def.'s App. Ex. D.)

Plaintiff testified that as of that date, June 23, 2005, she was not physically able to return

to work and she had no understanding of when she would be able to do so.  (Nolan Dep. at 86-

87.)

By letter dated June 28, 2005, Dr. Peters responded to Attorney Torlidas's June 23, 2005

---

[4]Pl.'s Ex. 4.

correspondence.  Dr. Peters stated "Please relate to your client to report to her supervisor at the

Highland Drive Division of the VA Pittsburgh Healthcare System on July 11, 2005 at 8:00 a.m."

(Def.'s App. Ex. E.)  By letter dated June 30, 2005, Attorney Torlidas stated via letter to Dr.

Peters that "[t]his is the SECOND NOTICE confirming that my client is returning to

employment."  (Def.'s App. Ex. F.)

Again, Plaintiff testified that, as of that date, June 30, 2005, she was not physically able to

return to work and she had no understanding of when she would be able to do so.  (Nolan Dep. at

89-90.)  She did not return to work on July 11, 2005 because she did not have a medical

authorization to return to work, she did not have such an authorization because she was still

being treated for foot problems and as of that date she was still not physically able to return to

work.  (Nolan Dep. at 90-91.)

By letter dated August 19, 2005, Dr. Peters informed Plaintiff as follows:

> You were previously informed that a review of your attendance record
> indicated you have not returned to duty since June 14, 2004. You were also
> advised that although your absences may have been for compelling reasons
> beyond your control, they continued beyond a reasonable time, and have directly
> impacted upon patient care.
>
> The intent of this letter is to notify you, that you are to report to duty to the
> Highland Drive Division of the VA Pittsburgh Healthcare System effective
> Monday, August 29, 2005. Please report to the Behavioral Health Administrative
> office, Building 1, 5th Floor, Room 5058w at 7:30 am. Arrangements will have
> been made in advance to re-activate your computer access. Since your clinical
> privileges have expired, arrangements have been made for you to resume your
> duties as a GS-11 Social Worker in the Center for Treatment of Addictive
> Disorders, under a functional statement/scope of practice. This functional
> statement/scope of practice will remain in effect until you are able to re-apply for
> and be granted clinical privileges. Until you are able to be granted clinical
> privileges, all of your clinical medical record documentation will require
> cosignature by your supervisor, Dr. Steven Perconte. It is expected that you will
> complete the clinical privilege process within the first 8-12 weeks from the date of
> returning to duty. You may secure additional information and assistance from Ms.

7

Brenda Hicks, Program Support Assistant, credentialing and privileging office, at (412) 365-4931. You will be given a list of mandatory medical center training from 2004 and 2005, that will need to be completed within two weeks of your return to work. This training, as you are aware, is completed utilizing the computer.

You are expected to meet with your supervisor, Dr. Steven Perconte on 8-29-05 at 8:00 am in the BHSL administrative office area. Dr. Perconte will review with you the functional statement/scope of practice and your performance standards. Both of these documents will need to be signed at that time.

Please be advised that if you fail to report for duty effective Monday, August 29, 2005, you will be placed in an AWOL status, and administrative action ultimately will be initiated against you.

(Def.'s App. Ex. G.)

Plaintiff did not return to work on August 29, 2005 because: "First, I did not have my clinical privileges. Second, I was not medically – I did not have medical clearance to return back to work.  At that time, I was in a hard cast for two stress fractures in the ankle."  (Nolan Dep. at 97.)  As of that date, she had no understanding as to when she would be physically able to return to work.  (Id.)

By letter dated October 31, 2005, the Dr. Rajiv Jain, Chief of Staff of the VA Pittsburgh Healthcare System, informed Plaintiff of the following:

. . .[P]lease be advised that by letter dated June 28, 2005, the Vice-President, Behavioral Health instructed you to return to duty on July 11, 2005 at 8:00 am. Although you failed to report to duty, you remained in a Leave Without Pay status, rather than being placed in an Absent Without Leave Status for your unexcused and unauthorized absences.

By letter dated August 19, 2005, the Vice-President, Behavioral Health again instructed you to return to duty on August 29, 2005 at 7:30 a.m. and informed you that if you failed to report to duty, you would be placed in an Absent Without Leave Status and administrative action would be ultimately initiated against you. You failed to report to duty. Therefore, you were placed in an Absent Without Leave status. To date, you still remain in an Absent Without Leave Status.

8

You are again being instructed to report to duty on November 7, 2005. Please report to the Behavioral Health Administrative Office area where you will meet with your supervisor, Dr. Steven Perconte on November 7, 2005 at 8:00 am....

Please be advised that if you fail to report to duty on November 7, 2005 at 8:00 a.m., administrative action will be initiated against you.

(Def.'s App. Ex. H.)  Plaintiff received this letter.  (Nolan Dep. at 105.)

By letter dated November 4, 2005, Attorney Torlidas responded to the VA's October 31, 2005

correspondence.  Specifically, she wrote that:

My office is in receipt of your correspondence directing my client return to work on November 7, 2005 at 8:00 a.m. This letter will confirm my voice mail to Attorney Frassinelli regarding Ms. Nolan's request to reschedule this date due to a previously scheduled physician's appointment.

Due to her disability, Ms. Nolan recently sustained two (2) new stress fractures; she received a hard cast for same last week. Her doctor's appointment is November 7, 2005.

It is my understanding that her physician needs to provide her with a Return to Work slip. Throughout her employment with the VA, Ms. Nolan has always been required to provide Return to Work slips from her treating physicians.

Please advise whether your office will reschedule the November 7, 2005 start date so that my client can attend her physician's appointment on November 7, 2005 and obtain the requisite Return to Work slip.

(Def.'s App. Ex. I.)

By letter dated November 4, 2005, Dr. Jain responded to Attorney Torlidas's letter, as

follows:

Per your request, although you have been instructed to report to duty on November 7, 2005, you will administratively be returned to duty on that date and granted leave without pay for your absence. However, you are required to report to duty on Tuesday, November 8, 2005 to the Behavioral Health Administrative Office area, Building 1, 5th Floor, Room 5058w at 7:30 a.m.

Please be advised that if you fail to report to duty on November 8, 2005 at 7:30 a.m., it will result in your charge of absent without leave and administrative action will be initiated against you.

(Def.'s App. Ex. J.)

When asked if she returned to work on November 8, 2005, Plaintiff responded as follows:

A: No.

Q: Why not?

A: Two reasons. One, is that I did not receive medical authorization to return back to work. I was still in a leg cast, so once again, I did not have my clinical privileges.

Q: As of November 8th, 2005, did you have an understanding as to when you would physically be able to return to work at the VA?

A: I don't know if I can really answer that question. All I know is that I was put in a leg cast, I had two stress fractures. I had been treated for stress fractures many times in the past, and, you know, I had the anticipation of returning back to work once the cast was removed, and put into a soft cast. So, I mean, did I actually know? The doctors wouldn't tell me how long. These were taking some time to heal. I was in a lot of pain, and I had to be off of it.

(Nolan Dep. at 107-08.)

By letter dated November 10, 2005, Dr. Peters informed Plaintiff that the VA was proposing to remove her from her position of social worker for "failure to maintain a regular work schedule; unexcused or unauthorized absences." (Def.'s App. Ex. K.)  The November 10, 2005 proposed removal informed Plaintiff that, between June 14, 2004 and November 10, 2005, she had used 2,704.75 hours of leave without pay, as well as 232.00 hours of sick leave.  (Id.) Further, she was advised that she had been placed in absent without leave status from August 29, 2005 to November 8, 2005, for a total absence from work of almost a year and a half.

Plaintiff testified in her deposition that she received the letter and that the reasons cited

therein, inability to maintain a regular work schedule, and for unauthorized absences, are the same reasons cited by the VA for her termination in December of 2005.  (Nolan Dep. at 109-10.) She acknowledged that, as of that date, November 10, 2005, she was not physically capable of returning to work at the VA.  (Nolan Dep. at 110.)

On November 30, 2005, Attorney Torlidas wrote to Dr. Peters, stating as follows:

> Your letter sets forth a timeline which confirms that my client was never disciplined in any way for the period she went out on disability (June 14, 2004) until it was discovered that Behavioral Health failed to place her clinical privileges on "hold" status (May 2005). Your letter further confirms that the VA never expressed any "concerns" to Ms. Nolan about patient care or her ability to do her job until June 14, 2005, long after Behavioral Health's clinical privileging error was discovered.

> Your timeline does not make a notation of the numerous letters from my office wherein Ms. Nolan attempted to resolve what she hoped was a mere clerical error regarding Behavioral Health's failure to place her CME credits on "hold" status during the time she was out on disability. Your timeline also fails to include the voluminous correspondence from Ms. Nolan throughout the time she was out on disability.

> Your letter fails to confirm that my client remains without clinical privileges to the present day, and that Behavioral Health's error has not been rectified despite repeated requests and every professional courtesy.

> Your letter fails to note the advance correspondence from my office prior to the return to work dates set by Behavioral Health. My office sent a letter dated July 7, 2005 via fax which fully set forth Ms. Nolan's concerns which needed to be addressed prior to the July 11, 2005 return to work date. I also spoke with Attorney Frassenelli several times in follow-up to the July 7, 2005 correspondence. To date, the concerns of my July 7, 2005 letter have not been addressed.

> Most troubling, your letter fails to note that the current medical problem which is preventing Ms. Nolan from returning to work is a HARD CAST on her leg. My office copied Dr. Jain on all the medical records confirming recent cast application. As you are well aware, a hard cast is temporary. Ms. Nolan's November 17, 2005 medical appointment with Dr. Mendocino's office did take place: the hard cast shall remain on for another 3 weeks, until her December 8, 2005 appointment. Copies of Dr. Mendocino's November 17, 2005 script

prohibiting return to work until next appointment, as well as the X-ray bill, is attached for your review.

The VA's proposal to remove Ms. Nolan from her position based upon her inability to return to work because of a HARD CAST is further evidence of the discrimination and retaliation which continues to the present. Any allegation that Ms. Nolan's absence has jeopardized patient care is without merit: Behavioral Health never expressed any concerns about patient care until Ms. Nolan LOST her clinical privileges. Patient care cannot be jeopardized now, when my client cannot treat patients due to her loss of clinical privileges.

One would hope that the VA would not use the hard cast as a ruse, a "lucky break", to terminate an employee with a perfect work record, all because she had the temerity to prevail before Judge Todd.

Please advise as to whether the VA will defer Ms. Nolan's return to work date until after her December 8, 2005 appointment.

(Pl.'s Ex. 1.)

At her deposition, when shown the November 30 letter, Plaintiff acknowledged that as of

that date she was not physically capable of returning to work at the VA and she did not know

when she would be able to return.  (Nolan Dep. at 111.)

The VA issued Plaintiff a notice of removal by letter dated December 7, 2005.  (Def.'s

App. Ex. L.)  The notice of removal indicated that Plaintiff would be terminated effective

December 17, 2005 and that "Reason 1 set forth in the letter of proposed removal is sustained."

(Id.)  Plaintiff notes that the notice of removal also states as follows:

Your conduct with the Agency has adversely impacted upon its efficiency of service.  It has inherently disrupted the productivity of the organization and has resulted in an undue burden upon both your supervisors and co-employees.  More importantly, these offenses have impacted upon the reputation of the Behavioral Health Service Line.

(Id.)

Plaintiff testified that she received this letter and that, as far as returning to work:

A: I was scheduled to see my physician, you know, the foot doc on December 8th, so on December 7th, I couldn't answer that question, because at that point I didn't know what the status was.

Q: As of December 8th, 2005, were you physically capable of returning to work at the VA?

A: No. I was requiring more time. The cast had to remain on...

(Nolan Dep. at 112.)

She further testified as follows:

Q: And you told me that you would not have been able to return to work following your December 8th, 2005 doctor's appointment; correct?

A: Correct. They put a new cast on.

Q: As of December 8th, 2005, did you have an understanding as to when you would be able to return to work?

A: The only thing that I was told by my doctors, that to follow up with them in four weeks, and see at that particular time whether the stress fractures healed enough to be able to remove me from the cast.

Q: And did you believe that the VA should have waited an additional four weeks then for you to have that next doctor's appointment before terminating you?

. . .

A: I don't know. I can't really answer that question. I don't know.

(Nolan Dep. at 79-80.)

When asked if she could return to work at the present time (i.e., February 10, 2009),

Plaintiff testified as follows:

A: No.

Q: Have you been physically capable of performing your work as a social worker at the VA at any time between December 17, 2005, to the present?

A: I didn't realize the extent of the damage to my foot until probably February or

13

March. What I thought was –

Q: February or March of what year?

A: I'm sorry. 2006. I had the stress fractures, and I found out that I also had the posterior tibial tendon dysfunction. It wasn't until I went to the orthopedist that I actually found out that I had a very severe – like level 4 was the highest, and that if I didn't have triple arthrodesis, triple bone fission, that I would eventually lose a foot.

So that's why in 2006, I went – had undergone the extensive bone fusion. Unfortunately, I didn't find out until a year later that it didn't take. None of the bones fused. That foot needs resurgery. However, my right foot has now developed the same thing. So I was out. I didn't return home for four months, and I had my left foot operated on because I had the – holding a walker on one leg for four months, so there was no way I could do that. Plus my right knee, where I had the total knee replacement was swelling up. It was giving me problems, so I have to follow up with the surgeon who did that. So, to answer, there is no way I can return to work at this point.

(Nolan Dep. at 117-18.)

Plaintiff applied for and was approved for Social Security disability benefits and she is still receiving them.  (Nolan Dep. at 118.)  She also applied for VA disability retirement in January 2006 and was approved for it in April 2006.  She is currently still receiving it.  (Nolan Dep. at 119.)

When asked whether there was an accommodation that she believed would have permitted her to attend work between June 14, 2005 and December 17, 2005, Plaintiff responded as follows:

A: I wasn't allowed to return to work. I was on medical leave in which the VA acknowledged, you know, did not – I was never told that I had to come back to work to do this. All I know is that the VA has the ability to [toll] clinical privileges for those who were out for a period of time or for those in the military. So, you know, my feeling is that, especially if they knew that I was going to be out with a total knee replacement, that I was going to be out for a longer period of time, at that point, my clinical privileges should have been put on hold, and that never happened. So they just allowed my clinical privileges to expire.

14

Q: But what I'm trying to understand is – let's assume that the VA had [tolled] your clinical privileges, would that have allowed you to attend work between June 14, 2004 and December 17, 2005? . . .

A: Right. I was – my doctor had not given me the okay to return back to work at that time.

Q: So even if your clinical privilege were valid, you would not have been able to work between June 14, 2004 and December 17, 2005?

A: Yes.

(Nolan Dep. at 72-74.)

From 2001 through 2004, there were four social workers employed in the VA's CTAD, including Plaintiff.  (Nolan Dep. at 34.)  She explained that responsibilities were assigned as follows:

A: . . . Whenever a new [inpatient program] patient would come in, there would be a list, and on that list see how many patients each staff person would have. So depending on the number of people you had, you know, if you didn't have too many, then you got the new ones. So it was handed down by whoever had the fewest patients, then picked up the new patients. So that was just for the inpatient. Outpatient programming, there was a male psychologist, master of psychology, he ran, did a lot of the outpatient program, and I also worked with him, and so we sort of shared the outpatient.

(Nolan Dep. at 34-35.)

When asked how work was reassigned if someone was absent, she stated.

A: It all depends on inpatient or outpatient. If it's outpatient, then you have the outpatient person who would pick up and see that individual. If it was inpatient, you know, I always made sure that my material for that particular group was available to staff. But if it was my group, even if someone would just come in and conduct a group, or lots of times it would happen that they would put a video in, and then have someone come in and talk about the video for like the last half hour of the group.

Q: And when you say "someone would come in," would that be another social worker would come in and either lead the group or talk after the video?

15

A: It could be a social worker, it could be a nurse, psychologist, it could be any one of them.

Q: But some other staff person in the CTAD area?

A: Yes.

(Nolan Dep. at 36-37.)

Plaintiff was asked if she had any discussions with anyone about who might be picking up her job responsibilities in her absence.  She responded:

A: What I did do was talk with the staff to let them know to have the outpatient social worker – I mean the psychologist pick up some of my outpatient cases, because I talked to him about that before. If I was out – and we both had the same agreement. If he was out, he would pick up mine, and if I was out then he would pick up – vice versa. I would pick up his and he would pick up mine. So inpatient, that would have been – I can't say. It would be whoever had some time to take care of their group or just put a video in there.

(Nolan Dep. at 81-82.)  She also stated that she let the head nurse know that other CTAD staff members would cover her inpatient groups.  (Id. at 82-83.)

During the EEO investigation of this case, Dr. Peters was asked by the interviewer about Plaintiff's absence from work between June 14, 2004 and her December 17, 2005 termination:

Q: Okay. Doctor, was the [Plaintiff's] absence causing a hardship for the [CTAD] unit?

A: Yes, sir.

Q: And can you please tell me how her absence was causing this hardship?

A: Our drug and alcohol program was staffed with the intention of having four social workers available to help with the multiple duties needed to keep our drug and alcohol program functioning efficiently[;] Ms. Nolan's absence represents the loss of one-fourth of that clinical capacity. Multiple changes had to occur in that program so that other staff could keep the program running during her absences.

* * *

16

A: It was necessary to redistribute the work of the other social workers, who all had full case loads at the time, in order to accommodate the absence of Ms. Nolan in the Center for the Treatment of Addictive Disorders. Important functions in the Core program, which is the two-week intensive drug and alcohol rehab program, and in the Outpatient Substance-use Post-Traumatic Stress Disorder Clinic had to be realigned so that the three social workers with ongoing fully case loads could absorb the case load for the fourth unavailable social work position. That meant that there were proportionally more social work assessments for each of the remaining staff to do...

There was a loss of social work services in the Substance-use Post-Traumatic Stress Disorder Clinic, because the one social worker in that program was helping cover the Core program. There were fewer group therapies available in the Substance-use Post-Traumatic Stress Disorder Treatment team because three staff needed to provide the capacity of the intended four. We had to withdraw, reduce, or eliminate some existing programs, which meant that some of our social work coverage for our Methadone Maintenance Program, and our ability to provide some case management for complicated dual diagnosis patients had to be cut back. Group therapies intended to work on skills development had to be cut back. Some of the Core educational group programs that had been previously provided by social workers were replaced by other staff such as unit physicians, psychiatrists, and clinical psychologists, which limited their ability to absorb new workload....

There was a persistent reduction in staff morale, I was approached at least a dozen times individually as a Service Line Vice President by staff, commenting that they needed more help in the service, but that could not be considered while Ms. Nolan's position was filled but she was not available for work.

(Def.'s App. Ex. M at 12-13, 14-17.)

When asked about how she currently spends a typical day, Plaintiff testified that she is "house bound. Basically the only time that I do go out is for doctor's appointment[s] or – basically doctor's appointments, or if I go over to my mother's and celebrate a birthday or something like that, but I am house bound." (Nolan Dep. at 8.) She has her groceries delivered and her laundry picked up, laundered, and delivered to her apartment. (Id.) She is unable to cook or stand for any period of time. (Id. at 9.)

History of Plaintiff's EEO Complaints

17

Plaintiff has filed three formal Complaints of Employment Discrimination against the VA. (Nolan Dep. at 40-41.) The first formal EEO Complaint, EEOC # 170-A2-8431X, is dated July 16, 2001. (Id. at 41-42.) On May 11, 2004, Administrative Judge Julie Procopiow Todd ("AJ Todd") issued a decision in which she concluded as follows: 1) Plaintiff established a prima facie case of disability discrimination regarding the VA's failure to reasonably accommodate her request to have her office moved, beginning on February 9, 2001 and ending on July 29, 2001 and the VA lacked good faith in its "attempts" to reasonably accommodate her, particularly because she re-injured her left rotator cuff on April 30, 2001 but the VA took no action on her request until an EEO counselor was brought into the matter in June 2001; 2) she failed to establish a prima facie case of sex discrimination because she did not point to a comparator who received better treatment; she failed to establish a prima facie case of a hostile work environment based on sex or disability; but 3) she established a prima facie case of retaliatory harassment based on her EEO complaint filed on June 8, 2001 (except as to certain activities that began prior to that date). AJ Todd ordered compensation for leave Plaintiff was forced to take from July 29, 2001 to the date of the decision, permanent reinstatement of her 7:30-4:00 shift, removal of Dr. Georgette Bellucci as her supervisor, training for VA managers and supervisors in the Rehabilitation Act's requirements, posting of copies of the notice, compensatory damages and pecuniary damages for medical treatment (but not non-pecuniary damages) and attorney's fees of $79,289.90 for Attorney Torlidas (her present counsel) and $22,562.50 for Attorney Love. (Pl.'s Ex. 10.)

The VA and Plaintiff both appealed various aspects of this decision. On June 7, 2006, the EEOC's Office of Federal Operations issued a decision modifying AJ Todd's decision as

follows: 1) it reduced Attorney Love's compensation to $14,062.50 because some of his work appeared to duplicate that of Attorney Torlidas; 2) it reduced Attorney Torlidas's fees to $76,889.15 because some of her work occurred prior to the date the administrative complaint was filed and the VA had not agreed to pay it; 3) it determined that AJ Todd had not erred in cutting off pecuniary damages at February 2003 because Plaintiff presented no documentation to support damages after that date; and 4) it determined that AJ Todd erred in denying non-pecuniary damages for pain and suffering and awarded them in the amount of $10,000 (not $300,000 as requested by Plaintiff's attorney).  Nolan v. Nicholson, Appeal No. 07A40119, 2006 WL 1667528 (June 7, 2006).[5]

The second formal EEO Complaint against the VA is dated September 12, 2005, and was filed on September 22, 2005.  (Id. at 44-45; See Def.'s App. Ex. N.)  This complaint challenged the VA's failure to place Plaintiff's clinical privileges on inactive status while she was on disability leave.  The record contains no further information about this complaint.

The third formal EEO Complaint against the VA is dated February 13, 2006, and was filed on February 21, 2006.  (Nolan Dep. at 48; See Def.'s App. Ex. O.)  This Complaint was assigned EEO Case Number 200H-0646-2006101008, and the issues accepted for investigation (pursuant to Plaintiff's letter of March 21, 2006 correcting the bases) were:

> Whether the complainant was discriminated against on the bases of disability
> (total knee replacement, stress fractures, lupus, arthritis and limited mobility due
> to foot deformity and pain) and reprisal for prior EEO activity with regard to an
> adverse action when:
>
> 1. On December 17, 2005, she was removed from her career status Social Worker

---

[5]Although this document is not included in the materials supplied by the parties, it is referenced therein and is a "public record" that the Court was able to access on WESTLAW.

position.

(Def.'s App. Exs. P, Q.)  On May 17, 2007, a Final Agency Decision was issued by the Office of

Employment Discrimination Complaint Adjudication (OEDCA), which concluded that, even

assuming Plaintiff established a prima facie case of disability or reprisal discrimination,

Defendant had proffered a legitimate, non-discriminatory reason for her termination (i.e., that she

had been absent for 18 months and could not return to work) and she produced no evidence that

this reason was a pretext for unlawful discrimination.  (Compl. Ex. A.)  The decision notified her

that she had 30 days in which to file an action in court, if she wished.

Procedural History

Plaintiff filed this action on June 14, 2007.  The complaint states that "This Court has

jurisdiction over appeals from Final Agency Decisions, as reflected in Defendant's own Notice of

Right to File in District Court, the last two pages of Exhibit A."  (Compl. ¶ 21.)  Although the

complaint is not divided into counts, it alleges that she was discriminated against in two respects:

on the basis of her disability and in reprisal for prior EEO activity.  As discussed in the OEDCA

decision and as discussed below, her disability claim must be based on the Rehabilitation Act of

1973, 29 U.S.C. §§ 791-797(b), because she was a federal employee, Title VII does not apply to

claims of disability discrimination and the ADA does not apply to the federal government.

Moreover, her retaliation claims must be based on Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e-3(a), as referenced and/or incorporated into the Rehabilitation Act.

On April 30, 2009, Defendant filed a motion for summary judgment.

Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving

party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©. Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty- Lobby, Inc., 477 U.S. 242, 248 (1986).

Defendant argues that: 1) Plaintiff cannot state a prima facie case of disability discrimination because she was not qualified to perform an essential function of her job in that she was absent from the workplace for eighteen months; 2) she cannot state a prima facie case of retaliation discrimination because she cannot establish a causal link between her alleged protected activity and her termination; and 3) even if she could state a prima facie case of either disability or retaliation discrimination, the VA has proffered legitimate, non-discriminatory reasons for her termination and she has not proffered evidence from which a trier of fact could conclude that these reasons are a pretext for unlawful discrimination

Plaintiff responds that: 1) neither party knew that Plaintiff could not perform the essential

21

duties of her job as of December 8, 2005, the date she expected to have her cast removed and receive a doctor's slip authorizing her return to work, but Director Moreland refused to wait one more day to terminate her; 2) she has established a causal link between her EEO complaints and her termination based on the fact that Director Moreland's stated reason for her termination was that she had damaged Behavioral Health's reputation, which she contends represents evidence that the true reason was retaliation for her having successfully challenged the VA in her EEO complaint and ongoing antagonism by the same individuals at the VA (Dr. Merrill, who is supervised by Dr. Bellucci, was involved in Plaintiff's termination); and 3) although Defendant cites service problems, it has provided no documentation to support this claim.

  <u>Disability Discrimination Claims</u>

  Plaintiff alleges that she was discriminated against on the basis of several disabilities: Systemic Lupus Erythematosis and Immuno-Suppression; degenerative joint disease in both feet and legs; history of multiple stress fractures in spine, hip, both feet and legs; Lymphedema; Osteo- and rheumatoid arthritis throughout the body; Discectomy at L4-L5; Rotator Cuff surgeries for both left and right shoulders; Right total knee replacement; Left triple arthrodesis; Hypertension; Mitrovalve Prolapse; Diverticulitis; Seizure disorder; Neurogenic Bladder; Osteoporosis; chronic pain. Defendant does not dispute that Plaintiff suffers from many physical problems, but it contends that she has not established that she was qualified to perform an essential function of her job in that she was absent from the workplace for eighteen months.

  Title VII, section 717, which governs employment by the federal government, prohibits "discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Plaintiff does not allege any of these forms of discrimination in her complaint. Nor is the

Americans With Disabilities Act, 42 U.S.C. §§ 12101-12117 (ADA), a potential basis for jurisdiction in this case because the ADA does not apply to the federal government.  See 42 U.S.C. §§ 12111(2), 12111(5)(B)(I) (excluding the United States from the definition of "employer" under the ADA).  See Hiler v. Brown, 177 F.3d 542, 544 n.4 (6th Cir. 1999); Zimmerman v. Oregon Dept. of Justice, 170 F.3d 1169, 1172 (9th Cir. 1999); Rivera v. Heyman, 157 F.3d 101, 103 (2d Cir. 1998).

Rather, the exclusive means by which a federal employee can challenge discrimination in employment based on a disability is the Rehabilitation Act of 1973, 29 U.S.C. §§ 791-794(e).[6] Section 501 of the Act, as augmented by section 505(a)(1), prohibits discrimination by federal employers on the basis of disability and incorporates the remedies, procedures and rights of employees proceeding against private employers under Title VII.  29 U.S.C. §§ 791(b), 794a(a)(1).  In addition, section 504 of the Act bars both federal agencies and private entities that receive federal funding from discriminating on the basis of disability and is not limited to the employment context.  29 U.S.C. § 794(a).  The Court of Appeals has held that federal employees suing federal employers are required to exhaust administrative remedies as provided in Title VII. Freed v. Consolidated Rail Corp., 201 F.3d 188, 191-92 (3d Cir. 2000); Spence v. Straw, 54 F.3d 196, 201 (3d Cir. 1995).

In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas

---

[6]Nevertheless, the Rehabilitation Act expressly makes the standards set forth in the ADA applicable to federal employers.  29 U.S.C. § 791(g).

Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  Farrell v. Planters

Lifesavers Co., 206 F.3d 271, 278-79 (3d Cir. 2000).

>    As the Court of Appeals for the Third Circuit has stated:

>>    The existence of a prima facie case of employment discrimination is a
>>    question of law that must be decided by the Court.  It requires a showing that: (1)
>>    the plaintiff belongs to a protected class; (2) he/she was qualified for the position;
>>    (3) he/she was subject to an adverse employment action despite being qualified;
>>    and (4) under circumstances that raise an inference of discriminatory action...

Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

>    If the employee presents a prima facie case of discrimination, the employer must

"articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."

McDonnell Douglas, 411 U.S. at 802.  If the employer specifies a reason for its action, the

employee must have an opportunity to prove the employer's reason for the adverse employment

action was a pretext for unlawful discrimination.  Id. at 804.  The Court of Appeals for the Third

Circuit has stated that:

>>    [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's
>>    proffered  legitimate  reasons must allow a factfinder to reasonably infer that each
>>    of the employer's proffered non-discriminatory reasons was either a post hoc
>>    fabrication or otherwise did not actually motivate the employment action  (that is,
>>    the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).  This framework applies

to discrimination cases brought under the Rehabilitation Act.  Wishkin v. Potter, 476 F.3d 180,

185 (3d Cir. 2007).

>    The Court of Appeals has held that:

>>    To establish a prima facie case of discrimination under the Rehabilitation Act, a
>>    plaintiff must initially show, "(1) that he or she has a disability; (2) that he or she
>>    is otherwise qualified to perform the essential functions of the job, with or without
>>    reasonable accommodations by the employer; and (3) that he or she was

> nonetheless terminated or otherwise prevented from performing the job." The existence of a prima facie case of employment discrimination is a question of law that must be decided by the court but the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied. <u>Sarullo v. United States Postal Serv.</u>, 352 F.3d 789, 797-98 (3d Cir.2003) (per curiam).

<u>Id.</u> at 184-85 (quoting <u>Shiring v. Runyon</u>, 91 F.3d 827, 831 (3d Cir. 1996)).

Defendant contends that Plaintiff cannot meet the prima facie element of demonstrating that she was qualified to perform the essential elements of her job because of her lengthy absences. Plaintiff indicates that she:

> does not dispute that her position required her to work at Defendant's facility. Neither does she dispute that she lacked the requisite medical clearance from her treating physicians and surgeons to return to work for the period June 14, 2004 through December 7, 2005, the date of Director Moreland's termination letter.

(Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at 14.)[7]

However, she argues that neither party knew that Plaintiff could not perform the essential duties of her job as of December 8, 2005, the date she expected to have her cast removed and receive a doctor's slip authorizing her return to work, but Director Moreland refused to wait one more day to terminate her. (Nolan Dep. at 75-76.)[8] But this characterization of the situation is belied by the record: Plaintiff had been off of work and unable to return to her job duties since June 14, 2004. She admits that she was physically unable to be present at work and that this was an essential function of her job. To claim that "no one knew" her status as of December 8, 2005 is simply not true.

At her deposition, the only accommodation she described was her opinion that the VA

---

[7]Docket No. 43.

[8]Pl.'s Ex. 3.

should have tolled her clinical privileges until she returned to work.  (Nolan Dep. at 72-74.)
However, she acknowledged that, even if the VA had done so, she still would not have been able
to return to work because her doctors had not cleared her to return.  She also contends that she
requested the "reasonable accommodation" of waiting until December 8, 2005 to determine her
status.  However, she still would not have been able to return to work after December 8, 2005
because her doctor told her to follow up with him in four weeks to determine whether her stress
fractures had healed.  (Nolan Dep. at 79-80.)  Thus, the accommodation she requested but did not
receive would not have enabled her to perform the essential functions of her job in any event.

Plaintiff cites Turner v. Hershey Chocolate U.S.A., 440 F.3d 604 (3d Cir. 2006), in which
the Court of Appeals held that the plaintiff met her burden of demonstrating that her proposed
accommodation–not fully participating in the employer's rotation scheme designed to prevent
repetitive stress injuries–was reasonable and the employer failed to support its claim that her
proposal would have posed a danger to herself or other employees.  However, contrary to her
contention, her situation is not comparable to that of the plaintiff in Turner.

As Defendant observes, a request to keep Plaintiff's job open indefinitely is not a
reasonable accommodation.  See Peyton v. Fred's Stores of Ark., Inc., 561 F.3d 900, 903 (8th
Cir. 2009), pet. for cert. filed, 78 USLW 3058 (July 14, 2009).  Plaintiff has cited no authority to
the contrary.  Thus, Plaintiff has not established that she was qualified to perform the essential
functions of her job, with or without a reasonable accommodation, and she has not demonstrated
a prima facie case of disability discrimination.

Retaliation Claim

As noted above, the Rehabilitation Act incorporates the rights, remedies and procedures

26

of Title VII.  Discrimination against an individual who has opposed a practice prohibited by Title

VII or who has made a charge, testified, assisted or participated in any manner in an

investigation, proceeding or hearing under the statute is itself actionable conduct.  42 U.S.C.

§ 2000e-3(a).[9]

As summarized by the Court of Appeals, the prima facie case elements for a claim of

retaliation under the Rehabilitation Act are as follows:

> plaintiffs must show (1) that they engaged in a protected activity, (2) that
> defendants' retaliatory action was sufficient to deter a person of ordinary firmness
> from exercising his or her rights, and (3) that there was a causal connection
> between the protected activity and the retaliatory action.  A defendant may defeat
> the claim of retaliation by showing that it would have taken the same action even
> if the plaintiff had not engaged in the protected activity.

Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (footnote and

citations omitted).  Defendant argues that Plaintiff cannot demonstrate a causal connection

between her protected activity and her termination on December 17, 2005.

The Court of Appeals has explained that a plaintiff can substantiate a causal connection

between the protected activity and an adverse employment action by: 1) showing that the

temporal proximity is "unduly suggestive"; or 2) showing "inconsistencies in the defendant's

testimony"; or 3) pointing to ongoing antagonism.  Farrell v. Planters Lifesavers Co., 206 F.3d

271, 280-81 (3d Cir. 2000).  The court has noted that, "[w]ith one exception, we have never held

that timing alone can be sufficient to establish causation."  Weston v. Commonwealth of Pa., 251

F.3d 420, 431 n.5 (3d Cir. 2001) (citing a case in which an employee's dismissal two days after

the company learned of his EEOC complaint was sufficiently persuasive to satisfy the causation

---

[9]In addition, an anti-retaliation regulation implementing section 504 states the same
proposition.  34 C.F.R. § 100.7(e).

element).  In <u>Weston</u>, the court held that alleged incidents more than one year apart, without

other evidence, were insufficient to establish a causal link).  <u>Id.</u> at 431-32.

Plaintiff acknowledges that neither Dr. Peters nor Director Moreland ever made any

comments to her about her EEO complaints.  (Nolan Dep. at 62, 66, 74.)  <u>See also</u> Nolan Dep. at

76.[10]  However, she contends that she was fired by the same supervisor (Dr. Bellucci) who was

found liable for having discriminated against her in that case.  Her complaint alleges that the

reprisal was swift: the EEO order was entered on May 10, 2004 and on June 14, 2004 Dr. Peters

failed to toll her clinical privileges as required when an employee goes on disability leave.

However, in response to Defendant's motion for summary judgment, she indicates that it is her

termination that constitutes the "adverse employment action" in this case.  (Docket No. 43 at 9.)

In either event, there are numerous problems with Plaintiff's argument.  First, the

protected activity she is relying on is the first EEO complaint, which was filed in 2001.  She cites

no authority to support the contention that her "protected activity" should be measured from the

time she received a "favorable result," namely on May 11, 2004, when AJ Todd issued a decision

in her favor.  Thus, over fours years elapsed from the time she engaged in the protected activity

of filing an EEO complaint (July 16, 2001) and the date she was terminated (December 17,

2005).  Moreover, three years elapsed from the time she engaged in the protected activity of

filing an EEO complaint and when she was subjected to the "adverse employment action" of not

having her clinical privileges tolled.  This span of time is still too long to establish a causal link,

even assuming that the VA's failure to toll her clinical privileges represents an adverse

employment action.

_____

[10]Def.'s App. Ex. S (Docket No. 47).

Second, and more significantly, this case is not about the tolling of her clinical privileges.
Rather, it arises out of her termination from employment.  Plaintiff attempts to connect these
events because, she contends, she could not return to work while her clinical privileges remained
in an expired status.  However, this argument is belied by the record: as cited above, on August
19, 2005, Dr. Peters instructed Plaintiff to return to work on August 29, 2005 and in his letter he
recognized that her clinical privileges had expired, but he stated that she would be expected to
begin the process of re-applying for them shortly after her return and he further indicated that,
until they were reinstated, all of her clinical medical record documentation would require the co-
signature of her supervisor.  (Def.'s App. Ex. G.)  Thus, although Plaintiff stated at her
deposition that she could not return to work because her clinical privileges had expired (in
addition to the fact that she was physically unable to do so), her employer did not support this
contention.  Nor does she cite to any documentary support for this argument.  Moreover, she also
admitted that she could not have returned to work even if her privileges had been tolled because
her doctors had not cleared her to return.  (Nolan Dep. at 72-74.)  Plaintiff cannot create a
genuine issue of material fact by offering her own opinion that she could not return to work while
her clinical privileges were expired when her employer–who knows the requirements for her
employment–has provided evidence to the contrary.

Finally, Plaintiff contends that Dr. Merrill, who is supervised by Dr. Bellucci, was
involved in her termination.  However, Dr. Merrill specifically testified that she did not complain
about Plaintiff's absence to Dr. Peters, that she was not consulted by Dr. Peters regarding
Plaintiff's termination and that she never recommended to anyone that Plaintiff be terminated.

(Merrill Dep. at 13.)[11]  Dr. Bellucci also testified that she (Bellucci) never placed any complaints about Plaintiff not being at work.  And although Dr. Bellucci testified that she was Dr. Merrill's supervisor and that she did receive a complaint from Dr. Merrill, the complaint was that there were staff shortages in the program because of Plaintiff's lengthy absence.  (Bellucci Dep. at 9-10.)[12]  Finally, Plaintiff points to Dr. Peters's testimony before the EEOC investigator, during which he indicated that Dr. Merrill had provided him with a 3-page summary of the changes that had to occur to the CTAD program while Plaintiff was unable to come to work.  (Def.'s App. Ex. M at 14.)  However, Dr. Peters's testimony is not inconsistent with Dr. Merrill's: she may not have complained to him but rather compiled the summary of changes that had to occur at his request.

In any event, Dr. Merrill is not Dr. Bellucci, Plaintiff cannot claim "ongoing antagonism" when the VA accommodated her absence and repeated requests for extension of time for eighteen months, and there is no evidence that either of these individuals was responsible for Plaintiff's termination.  Plaintiff quixotically contends that her direct supervisor was still Dr. Bellucci (in defiance of AJ Todd's order that she be removed as Plaintiff's supervisor) and not Dr. Stephen Perconte, as the VA states, because she (Plaintiff) never returned to work for him.  Plaintiff stated at her deposition that Dr. Perconte's supervisor was Dr. Bellucci (Nolan Dep. at 127),[13] but she offers no evidence to support this contention other than her own statement.  Although Plaintiff may never have worked for Dr. Perconte, that is the result of her never having returned

---

[11]Pl.'s Ex. 9.

[12]Pl.'s Ex. 7.

[13]Pl.'s Ex. 12.

to work and she offers no evidence to rebut Defendant's contention that the VA made Dr.

Perconte her supervisor.

More importantly, Defendant has proffered evidence that Dr. Peters was the proposing

official regarding Plaintiff's termination and that Director Moreland was the deciding official and

Plaintiff has proffered nothing other than her own unsupported opinion to the contrary.  Again,

Plaintiff cannot create a genuine issue of material fact by opining on matters that she has no

personal knowledge about.

Moreover, even assuming that Plaintiff could state a prima facie case of retaliation

discrimination, Defendant has articulated a legitimate, nondiscriminatory reason for her

termination: she was off work for eighteen months with no idea when she might be able to return.

Thus, it has met its burden of production and Plaintiff is required to demonstrate that this reason

is a pretext for unlawful retaliation discrimination.

Plaintiff proceeds along "Fuentes prong one" by arguing that she has submitted evidence

from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason.

Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).  Specifically,

she points to the fact that no one from the VA complied about patient care being compromised

until June 2005 (one year after her last day of work), when she first inquired about the tolling of

her clinical privileges.  (Nolan Dep. at 61.)  She also contends that Defendant has not cited any

evidence of record to support its claim that her absence was causing service problems.  But

Defendant has proffered evidence, in the form of testimony and letters from Dr. Peters, and

Plaintiff cites no authority to support the argument that an employer is required to "prove" (with

computer records) that an employee's lengthy absence is causing service problems.  Moreover,

Plaintiff acknowledged that her CTAD colleagues, including psychologists, nurses and social workers, were required to undertake her duties while she was absent, including leading group therapy sessions and handling outpatient responsibilities, in addition to performing their own job responsibilities.  (Nolan Dep. at 34-37, 81-83.)

Plaintiff's observations does not constitute such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Id. Following her argument, the VA could never have legitimately challenged her absence because it had not done so previously.  In fact, the VA accommodated her disability and requests for extension of time in which to return for eighteen months.  Although the VA eventually requested that she return to her position and began the process of removing her when she could not do so (and although people in the CTAD may have complained about the difficulties her lengthy absence was causing), these are legitimate concerns and do not constitute evidence of discrimination.  The record in this case simply does not support Plaintiff's claim that her termination was an act of retaliation.

Plaintiff also attempts to proceed along "Fuentes prong two" by arguing that Defendant's own notice of removal constitutes evidence that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Keller, 130 F.3d at 1111.  Specifically, she argues that Director Moreland's reference in the notice of removal to her having affected the "reputation of the Behavioral Health Service Line" demonstrates that the VA was retaliating against her after she obtained a successful

result in her EEO complaint.  (Nolan Dep. at 66.)[14]

Plaintiff has taken this line out of context.  In context, it follows "reason 1" from the letter of proposed removal (namely, her lengthy absence) and Director Moreland's specific comments about her having affected "the efficiency of service," "disrupted the productivity of the organization" and "resulted in an undue burden upon both [her] supervisors and co-employees." (Def.'s App. Ex. L.)  Thus, Moreland was not making a veiled reference to her EEO activity.  Rather, he was directly citing her lengthy absence and stating that it was negatively affecting the VA and its employees and therefore, the reputation of the organization.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 34) be granted.

Within the time specified in the Notice of Electronic Filing, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: October 2, 2009

---

[14]Pl.'s Ex. 2.